# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **SIGMAPHARM, INC.,** | : |
| **Plaintiff,** | : |
| **v.** | :    **CIVIL NO. 10-430** |
| | : |
| **MUTUAL PHARMACEUTICAL** | : |
| **COMPANY, INC.,** *et al.*, | : |
| **Defendants.** | : |

## MEMORANDUM OPINION & ORDER

**RUFE, J.**                                                           **March 2, 2011**

In its First Amended Complaint, Plaintiff SigmaPharm, Inc. brings claims for violation of Section 1 of the Sherman Act (count I),[1] Pennsylvania common law barring restraint of trade (count II), and Section 17200 of the California Business and Professions Code barring unlawful and unfair competition[2] (count III) against Defendants Mutual Pharmaceuticals Company, Inc. ("Mutual"), United Research Laboratories, Inc. ("United"), and King Pharmaceuticals, Inc. ("King"). Plaintiff also asserts a claim for breach of contract under Pennsylvania common law against Mutual and United only (count IV). Before the Court are: (1) a Motion to Dismiss counts I through III by Defendant King [doc. no. 40]; (2) a Motion to Dismiss all counts by Defendants Mutual and United [doc. no. 41]; (3) a motion to stay discovery pending this Court's resolution

---

[1] This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1337, and 15 U.S.C. § 15. It does not have jurisdiction pursuant to §1332(a) because SigmaPharm asserts its principal place of business is Pennsylvania, and both Mutual and United are Pennsylvania corporations. Because a corporation is a citizen of both its state of incorporation and the state in which its principal place of business is located, <u>see</u> 28 U.S.C. § 1332(c)(1), SigmaPharm is not diverse from Mutual and United. Complete diversity is required. <u>Owen Equip. & Erection Co. v. Kroger</u>, 437 U.S. 365, 373 (1978).

[2] Cal. Bus. & Prof. Code § 17200, *et seq*.

of the motions to dismiss by all Defendants [doc. no. 44]; and (4) a motion to compel discovery

by SigmaPharm [doc. no. 57]. For the reasons set forth below, the Court will dismiss the federal

antitrust claim for failure to state a claim, decline to exercise supplemental jurisdiction over the

state law claims pursuant to 28 U.S.C. § 1367(c), and dismiss the discovery motions as moot.

## I.  FACTUAL & PROCEDURAL BACKGROUND

SigmaPharm, a Delaware corporation, develops pharmaceutical technologies and

products and enters into agreements with other entities to commercialize them.[3] Mutual and

United (collectively "Mutual"), both Pennsylvania corporations, and King, a Tennessee

corporation, develop, manufacture, market, sell, and distribute pharmaceutical drugs.[4]

SigmaPharm's First Amended Complaint alleges that Mutual and King conspired to restrict the

output of generic equivalents to King's brand-name drug SKELAXIN, in violation of federal and

state antitrust law and in breach of SigmaPharm's development agreement with Mutual.

### A.  The SigmaPharm-Mutual Employment & Development Agreements

In March 1999, Mutual and SigmaPharm entered into two agreements: (1) a development

agreement between Mutual and SigmaPharm; and (2) an employment agreement between

SigmaPharm's President, Dr. Spiridon Spireas, and Mutual. The employment agreement

provided that Spireas would serve as Mutual's Vice President of Research and Development, and

assume responsibility for Mutual's laboratory and research activities related to obtaining Food

and Drug Administration ("FDA") approval of any new drugs it developed. Under the

---

[3] First Am. Compl. ("FAC") ¶¶ 2, 24.

[4] FAC ¶¶ 3–5.

development agreement, SigmaPharm served as a contractor to develop "innovations" for

Mutual. "Innovations" are inventions, improvements or enhancements to Mutual's

pharmaceutical products developed by SigmaPharm for which Mutual secures a patent or which

Mutual otherwise deems to be an "innovation."[5]  The development agreement provided that

Mutual had sole ownership of all rights, title and interest in any "innovation" in the U.S. market

as well as ownership of any U.S. Patents that might issue,[6] but SigmaPharm was entitled to

royalties from Mutual's manufacture and sale of any such pharmaceuticals in the United States.

For generic equivalents of name-brand drugs developed by SigmaPharm that required approval

under the FDA's Abbreviated New Drug Application ("ANDA") process, SigmaPharm was to

receive 10% of gross profits from Mutual's U.S. sales.[7]  But if additional generic competitors

entered the market, the royalties would decrease: with the entry of one, two or three additional

competitors, royalties declined to 5%, 2.5%, or 0%, respectively.[8]  And if Mutual licensed or sold

the right to sell the product, or "agreed to refrain from selling such product," SigmaPharm was to

---

[5]  FAC ¶¶ 29–31; Mem. in Supp. of King Pharms., Inc.'s Mot. to Dismiss Count I of SigmaPharm's First Amended Compl. ("King Mem.") Ex. 1.

Because SigmaPharm explicitly relies on the development agreement in its Complaint, FAC ¶¶ 29–38, this Court may consider the entire agreement attached as Exhibit 1 to King's Memorandum in support of its motion to Dismiss. See Lum v. Bank of Am., 361 F.3d 217, 222 n.3 (3d Cir. 2004) (in deciding a 12(b)(6) motion to dismiss, a court may consider exhibits attached to the complaint and documents that form the basis of the claim; a document forms the basis of the claim if it is integral to or explicitly relied upon in the complaint), *abrogated in part on other grounds as recognized in* In re Ins. Brokerage Antitrust Litig., 618 F.3d 300 (3d Cir. 2010).

[6]  FAC ¶¶ 32, 37; King Mem. Ex. 1 ¶¶ 3, 5.  The agreement provided SigmaPharm with equivalent interests and rights to the innovations in all other markets.  See FAC ¶ 32.

[7]  FAC ¶ 33; King Mem. Ex. 1 ¶ 4(b)(I).

[8]  FAC ¶ 33; King Mem. Ex. 1 ¶ 4(b) (ii)–(iv).

receive 25% of the gross profit from the licensing fees or royalties from that license, sale, or agreement.[9]

## B. The Abbreviated New Drug Application Process

The ANDA process was established by the Drug Price Competition and Patent Term Restoration Act of 1984 ("Hatch-Waxman Act").[10] The Hatch-Waxman Act establishes relaxed FDA approval procedures for generic equivalents of previously approved pharmaceutical drugs, allowing generic manufacturers to submit abbreviated applications.[11] Those procedures allow a generic drug manufacturer to bypass the safety and efficacy studies required for all new drugs so long as they establish the generic's bioequivalence[12] to a drug previously approved by FDA as safe and effective.[13] The ANDA must also provide information to show that the labeling for the generic is the same as the labeling approved for the listed drug, unless certain exceptions apply.[14] If a patent claims the previously approved drug that the generic copies, or claims a use for the previously approved drug for which the ANDA applicant seeks approval, the generic manufacturer must certify either that patent information has not been filed, the patent has

---

[9] FAC ¶ 34; King Mem. Ex. 1 ¶ 4(c).

[10] 21 U.S.C. § 355(j).

[11] Colacicco v. Apotex Inc., 521 F.3d 253, 260 (3d Cir. 2008), *vacated on other grounds*, 129 S. Ct. 1578 (2009).

[12] Under the Hatch-Waxman Act, bioequivalence generally requires that the extent of absorption of the generic drug not be significantly different from the approved drug when administered under similar experimental conditions. See 21 U.S.C. § 355(j)(8)(B).

[13] King Drug Co. of Florence, Inc. v. Cephalon, Inc., 702 F. Supp. 2d 514, 520 (E.D. Pa. 2010) (citing 21 U.S.C. § 355(j)(2)(A)).

[14] See 21 U.S.C. § 355(j)(2)(A)(v).

expired, the date on which the patent will expire, or that the "patent is invalid or will not be infringed by the manufacture, use, or sale of the new drug for which the application is submitted."[15] This last certification is known as a "Paragraph IV certification."[16] The generic manufacturer must notify the brand-name manufacturer and patent holder of its ANDA, after which the patent holder has 45 days to bring an infringement suit.[17] This notification is not required if the applicant certifies that the patent at issue protects only methods of using the drug and the patent does not claim a use for which the applicant is seeking approval[18]—a "Section viii" certification. If an infringement suit is filed, the FDA must stay approval of the ANDA until the earliest of: (1) the date the patent expires; (2) the date the district court holds the patent invalid or the generic non-infringing; or (3) 30 months from the date of the notice have elapsed.[19] If the generic is approved, the generic manufacturer enjoys a 180-day period of market exclusivity.[20]

### C.    Mutual's Second Generic to SKELAXIN & King's Method Patents

The dispute in this case arises from SigmaPharm's development, pursuant to the development agreement, of a generic equivalent of the brand-name muscle relaxant

---

[15] 21 U.S.C. § 355(j)(2)(A)(vii).

[16] See King Drug, 702 F. Supp. 2d at 520.

[17] Id.

[18] See 21 U.S.C. § 355(j)(2)(A)(viii) & (2)(B).

[19] See King Drug, 702 F. Supp. 2d at 520–21 (citing 21 U.S.C. § 355(j)(5)(B)(iii)).

[20] See id. at 521.

SKELAXIN.[21]  SKELAXIN's active ingredient, metaxalone, is no longer protected by patent.[22]

Thus the patents relevant here, licensed to Defendant King, claim new methods of administering

metaxalone (with food) that increase bioavailability[23] of the drug and the drug levels in a

patient's blood.  In early 2001, after Spireas developed a 400 mg metaxalone tablet that

demonstrated bioequivalence to SKELAXIN under fasting conditions (the "First Generic"),

Mutual successfully petitioned the FDA to require all ANDA's for generic SKELAXIN to

demonstrate bioequivalence under fasting conditions,[24] protecting its competitive position.  Later

in 2001, Elan Pharmaceuticals, which then owned the SKELAXIN trademark and the exclusive

right to sell and market that drug, sought the FDA's permission to amend SKELAXIN's label to

reference increased bioavailability of SKELAXIN when administered with food, and petitioned it

to require all ANDA's for generic SKELAXIN to demonstrate bioequivalence under both fasting

and non-fasting conditions.[25]  In March 2002, the FDA granted the petition, ordered all ANDA's

to comply with it, and subsequently approved the proposed labeling amendment.[26]

Elan then sought method patents for SKELAXIN associated with the drug's

administration under fed conditions.  In mid-2002, the U.S. Patent and Trademark Office issued

---

[21]  FAC ¶ 39.

[22]  The patent for metaxalone expired in 1979.  FAC ¶ 40.

[23]  "The term 'bioavailability' means the rate and extent to which the active ingredient or therapeutic ingredient is absorbed from a drug and becomes available at the site of drug action." 21 U.S.C. § 355(j)(8)(A)(i).

[24]  FAC ¶¶ 43–45.  FDA granted the petition on January 30, 2002.  FAC ¶ 45.

[25]  FAC ¶¶ 46–47.

[26]  FAC ¶¶ 48, 50.

to Elan the " '128 Patent," which claims "methods of increasing the bioavailability of metaxalone by administering [it] with food."[27]  Then, in January 2004, the USPTO issued to Elan the " '102 Patent," which was "directed to methods of providing metaxalone to patients while informing them that taking metaxalone with food results in higher blood levels of metaxalone."[28]  At some point after June 2002, Elan sold to King the SKELAXIN trademark and rights to market and sell that drug, and licensed the '102 and '128 patents to King.[29]

After the '128 Patent was issued, Spireas developed another SKELAXIN generic (the "Second Generic") that demonstrated bioequivalence under fed as well as fasting conditions, as required under the new FDA order.  In March 2003, Mutual filed an ANDA for that formulation, including a Section viii certification that the '128 Patent did not claim a use for which Mutual was seeking approval.[30]  Then, in January 2004, after the '102 Patent was issued, Mutual filed a Paragraph IV certification that its Second Generic would not infringe that patent.[31] In March 2004, FDA notified ANDA applicants that they need not include labeling regarding the increased bioavailability of metaxalone under fed conditions, undermining King's strategy to exclude generic competitors by requiring them to use labels that implicated King's method patents.[32]  The

---

[27]  FAC ¶ 49.

[28]  FAC ¶ 55.

[29]  FAC ¶¶ 41, 52.

[30]  FAC ¶¶ 53–54. Pursuant to the development and employment agreements, Mutual directed Spireas to file patent applications for novel formulations of metaxalone, including Mutual's Second Generic.  Id. ¶¶ 69–74.  In 2009, as required by the agreement, Spireas assigned the U.S. patent applications to Mutual.

[31]  FAC ¶¶ 56–57.

[32]  FAC ¶ 59.

notice thus allowed ANDA applicants to carve King's patented indications out of the label, permitting Mutual to market the Second Generic without implicating "the allegedly novel 'methods'" claimed in King's patents.[33]

In March 2004, King fought back, bringing an infringement action against Mutual in the Eastern District of Pennsylvania,[34] and petitioning the FDA to: rescind its March 2004 notice to ANDA applicants; require all ANDA applicants to submit a Paragraph IV certification against the '128 patent; and require generic labels to include information about increased bioavailability under fed conditions. King also asked FDA to stay approval of any ANDAs for SKELAXIN until it had decided the petition.[35] Mutual opposed each of these requests in multiple filings with the FDA between April 2004 and February 15, 2005.[36]

### D.    The Alleged Unlawful Agreement & Breach of Contract

Then things changed. On December 6, 2005, Mutual and King entered into a co-exclusive licensing agreement under which Mutual granted King a co-exclusive license for one of Mutual's method patents (the " '566 Patent"), which claims methods of administering metaxalone and informing users of potential drug interactions.[37] Two days later, Mutual

---

[33] FAC ¶ 60.

[34] FAC ¶ 58 (citing King Pharms., Inc. v. Mutual Pharms., Inc., No. 04-1083 (E.D. Pa.)). The infringement action is assigned to the Honorable Lawrence Stengel.

[35] FAC ¶¶ 61–62.

[36] FAC ¶¶ 63, 66, 68.

[37] FAC ¶ 84; Mem. in Supp. of Mutual Pharm. Co, Inc. & United Research Labs., Inc.'s Mot. to Dismiss First Am. Compl. Ex. 2. Because SigmaPharm references the licensing agreement in its Complaint, and its relevant terms were published in an SEC filing, this Court may take notice of the agreement to determine what the documents stated. See Lum, 361 F.3d. at 222 n.3; Oran v. Stafford, 226 F.3d 275, 289 (3d Cir. 2000).

withdrew its opposition to King's petition for labeling requirements for generic SKELAXIN and asked the FDA to withdraw its March 2004 notice that permitted ANDA applicants for generic SKELAXIN to omit labeling regarding bioavailability under fed conditions, threatening Mutual's ability to market its Second Generic without infringing on the '102 and '128 patents.[38] Then, in 2007, when King made a supplemental submission to FDA in support of its March 2004 petition and request for a stay of approval of any generic SKELAXIN ANDAs, Mutual submitted comments in support of King.[39] That same year, Mutual also petitioned FDA to require SKELAXIN generics to include labeling information that implicated the '566 Patent on drug interactions, and to withhold approval of any generic equivalent of SKELAXIN until drug interaction study results were included on the label[40]—a move that would impair the ability of other generic competitors to design their label to avoid the potentially infringing use.

The King-Mutual infringement litigation also sputtered. Though scheduled for a trial beginning in October 2006, on May 17, 2006, the Parties filed a joint stipulation under seal, after which the case was stayed pending an FDA decision on the generic label.[41] And when the '128 and '102 patents were held invalid by another district court,[42] Mutual neither informed the court

---

[38] FAC ¶¶ 82–83.

[39] FAC ¶¶ 85–86.

[40] FAC ¶¶ 87–88. Both petitions were denied. Id. ¶ 89.

[41] FAC ¶ 58; see also King Pharms., Inc. v. Mutual Pharms., Inc., No. 04-1083 (E.D. Pa.), doc. no. 40 (Order granting stay). The Court may take judicial notice of other court proceedings. Zdrok v. V Secret Catalogue, Inc., 215 F. Supp. 2d 510, 513 (D.N.J. 2002) (citing S. Cross Overseas Agencies, Inc. v. Wah Kwong Shipping Grp. Ltd., 181 F.3d 410, 426 (3d Cir.1999) and Fed. R. Evid. 201), vacated on other grounds, 108 F. App'x 692 (3rd Cir. 2004).

[42] King Pharms., Inc. v. Eon Labs, Inc., 593 F. Supp. 2d 501 (E.D.N.Y. 2009).

handling the infringement claim of that development nor sought to remove the case from suspense to assert its newly available defenses.[43]

Based on these facts, SigmaPharm's First Amended Complaint alleges that at some point between February 15, 2005, when Mutual last opposed King's FDA petition and request for stay of approval, and December 6, 2005, when Mutual and King entered into the co-exclusive licensing agreement for the '566 Patent, the two companies entered into an agreement to restrict output of generic equivalents to SKELAXIN, including Mutual's Second Generic.[44] SigmaPharm alleges King and Mutual intended to, and did, suppress output of the Second Generic, and agreed that Mutual would support King's efforts to suppress other generic competitors, allowing King to continue to sell SKELAXIN at prices higher than would have existed absent the agreement.[45] In exchange, Mutual allegedly received tens of millions of dollars.[46] SigmaPharm claims this agreement was a "naked, horizontal restraint of trade" in violation of Section 1 of the Sherman Act, Pennsylvania common law barring restraint of trade (Count II), and California statutes barring unlawful and unfair competition (Count III). And it

---

[43] FAC ¶ 90. On August 2, 2010, after the King-Mutual court ordered a status report, Mutual's counsel reported the favorable results of the King-Eon litigation but requested the matter remain stayed pending the outcome of the appeal and an FDA decision. King Pharms., Inc., No. 04-1083 (E.D. Pa. docketed Aug. 2, 2010) (doc. no. 46). The Federal Circuit later affirmed the district court's invalidity holdings. King Pharms., Inc. v. Eon Labs, Inc., 616 F.3d 1267 (Fed. Cir. 2010). SigmaPharm informed this Court of that development in a filing of supplemental authority. See Notice of Supplemental Authority [doc. no. 59].

[44] FAC ¶¶ 77–81, 84.

[45] FAC ¶¶ 80, 96.

[46] FAC ¶¶ 81, 96.

asserts the conspiracy injured SigmaPharm by depriving it of royalties it would otherwise have received under the development agreement from sales of the Second Generic, and injured consumers by artificially inflating prices for SKELAXIN.[47]

This case thus presents a variation on antitrust claims challenging settlement of infringement suits brought by brand-name manufacturers against their generic competitors—known as "pay-for-delay" settlements or "reverse-exclusion payments."[48]   In those cases, ordinarily brought by end-payers of the brand-name drug or the government, as part of the settlement agreement, the patent-holder-plaintiff pays the generic-competitor-defendant to delay its entry into the market.[49]   Here, however, Mutual and King have not reached a settlement of King's infringement action against Mutual; that action is still pending.

SigmaPharm also claims Mutual breached the development agreement by failing to pay SigmaPharm the 25% royalty it was due from Mutual's alleged agreement with King to refrain from marketing the Second Generic, by failing to perform their contract obligations in good faith, and by frustrating the terms of that agreement (Count IV).[50]

**E.     Defendants' Motions to Dismiss**

All Defendants now move to dismiss Counts I through III on grounds that: (1) SigmaPharm has failed to sufficiently allege an agreement; (2) SigmaPharm lacks antitrust standing for its Sherman Act claim because *inter alia* it has not pleaded antitrust injury; (3) the

---

[47]  FAC ¶¶ 101–103.

[48]  See Ark. Carpenters Health and Welfare Fund v. Bayer AG,  625 F.3d 779, 780 (2d Cir. 2010) (Pooler, J., dissenting).

[49]  See id.

[50]  FAC ¶¶ 122–125.

Pennsylvania common law restraint of trade claim fails because the Sherman Act claim fails; and (4) the California statutory unfair competition claim is not cognizable because the injury and misconduct took place outside California. Mutual also moves to dismiss the contract claim because SigmaPharm has not sufficiently alleged either a breach or a violation of good faith.

## II. STANDARD OF REVIEW

In reviewing a Rule 12(b)(6) motion to dismiss for failure to state a claim upon which relief may be granted, the Court must accept a plaintiff's factual allegations as true and draw all logical inferences in favor of the non-moving party.[51] Courts are not, however, bound to accept as true legal conclusions couched as factual allegations.[52] The Complaint must set forth "direct or inferential allegations [for] all the material elements necessary to sustain recovery under some viable legal theory."[53] And the plaintiff must allege "enough facts to state a claim for relief that is plausible on its face."[54] The court has no duty to "conjure up unpleaded facts that might turn a frivolous action . . . into a substantial one."[55]

For claims under Section I of the Sherman Act, a plaintiff must plead "enough factual matter (taken as true) to suggest that an agreement was made." The plausibility standard,

---

[51] ALA, Inc. v. CCAIR, Inc., 29 F.3d 855, 859 (3d Cir. 1994).

[52] Bell Atl. Corp. v. Twombly, 550 U.S. 544, 564 (2007).

[53] See id. at 562 (citations and quotations omitted).

[54] Id. at 570.

[55] Id. at 562 (citing McGregor v. Indus. Excess Landfill, Inc., 856 F.2d 39, 42–43 (6th Cir. 1988)).

however, "does not impose a probability requirement."[56]  Instead, the plaintiff need only state

enough facts to "raise a reasonable expectation that discovery will reveal evidence of illegal

agreement," even if the court believes such proof is improbable.[57]  But allegations of otherwise

lawful parallel conduct, without more, are insufficient to render an alleged conspiracy plausible.[58]

Instead, the parallel conduct "must be placed in a context that raises a suggestion of a preceding

agreement," rather than independent action.[59]  For example, parallel "conduct [that] indicates the

sort of restricted freedom of action and sense of obligation that one generally associates with

agreement" may be sufficient to state a claim of tacit conspiracy.[60]

## III. DISCUSSION

### A. Sherman Act Claim

#### 1. Sufficiency of SigmaPharm's Allegation of an Agreement

Defendants argue that SigmaPharm has not stated a Section 1 claim because SigmaPharm

has not pleaded sufficient facts to render a Mutual-King agreement plausible.[61]  First, Defendants

---

[56]  Id.

[57]  Id.

[58]  Id. at 556–57.

[59]  Id. at 557.

[60]  Id. at 557 n.4 (citing Blechman, Conscious Parallelism, Signalling and Facilitating Devices: The Problem of Tacit Collusion Under the Antitrust Laws, 24 N.Y.L. Sch. L. Rev. 881, 899 (1979)) (alterations in original).

[61]  See King Mem. at 5–6; King's Reply at 6–8.

Though Defendants moved to dismiss on grounds that SigmaPharm has not adequately pleaded harm to competition, they did so largely in the context of the standing inquiry.  See King Mem. at 15 (Sigmapharm cannot prove its injury was caused by the agreement where the generic had not been approved and King held a valid patent); King Reply at 10 (citing Warfield Phila. L.P. v. Nat'l Passenger R.R. Corp., No. 09-1002, 2009 WL 4043112, at *1-2, *5 (E.D. Pa. Nov. 20, 2009) in which antitrust

-13-

contend that Plaintiff's general allegation that the agreement to restrict output was entered into

between February 15, 2005 and December 6, 2005 is too vague and conclusory to support a

Section 1 claim.  While it is true that SigmaPharm provides no detail as to the specifics of when,

where and how the agreement was reached, in claims alleging tacit agreement where direct

evidence may be unavailable, Plaintiffs may rely "solely on circumstantial evidence (and the

reasonable inferences that may be drawn therefrom) to prove a conspiracy."[62]  To that end,

Plaintiffs alleged specific acts that they assert support an inference of conspiracy: (1) King's

payments to Mutual; (2) Mutual's support of King's FDA petition to prohibit labeling that carves

out infringing uses; (3) the sealed joint stipulation in the infringement action leading to an

indefinite stay and Mutual's failure to alert that court to the patent invalidity holding in the King-

Eon litigation; and (4) Mutual's FDA petition seeking labeling requirements regarding drug

interactions with metaxalone that would frustrate the entry of generic competitors.

---

injury was evaluated).  But SigmaPharm has pleaded a per se violation, see FAC at ¶ 98 (naked, horizontal restraint of trade), for which the harm to the marketplace is ordinarily presumed.  See Pace Elecs., Inc. v. Canon Computer Sys., Inc., 213 F.3d 118, 123 (3d Cir. 2000).  And Defendants did not argue in either their moving brief or their reply that the rule of reason test, applied by some courts evaluating pay-for-delay patent infringement settlements applies here, or that Plaintiffs have not adequately pleaded that the alleged agreement exceeded the scope of the relevant patents, as some courts have required under that test.  See King Drug Co. of Florence, Inc., v. Cepahlon, Inc., 702 F. Supp. 2d 514, 524–28 (E.D. Pa. 2010).  In their response to Plaintiff's Notice of Supplemental Authority, however, Defendants appear to belatedly suggest that this standard should be applied in this case.  See Defs.' Resp. to Pl.'s Notice of Supplemental Authority at 1–3 (citing Valley Drug Co. v. Geneva Pharms. Inc., 344 F.3d 1294, 1306–07 (11th Cir. 2003) and Joblove v. Barr Labs. Inc., 466 F.3d 187 (2d Cir. 2006)). Because Defendants failed to raise that issue in their moving memoranda, the issue has not been fully briefed, and the Complaint does not allege a pay-for-delay settlement, the Court declines to reach that issue.  See Schering-Plough Corp. v. F.T.C., 402 F.3d 1056, 1066 n.14 (11th Cir. 2005) (noting a "critical difference" between agreements that resolve litigation, to which rule-of-reason applies, and those that do not permit a generic company to market its product before patent expiration and which prolong rather than resolve a patent infringement action, for which a per se rule may be appropriate) (citing In re Terazosin Hydrochloride Antitrust Litig., 352 F. Supp. 2d 1279 (S.D. Fla. 2005)).

[62]  Rossi v. Standard Roofing, Inc., 156 F.3d 452, 465 (3d Cir. 1998).

Defendants argue these acts are insufficient to make a Section 1 conspiracy plausible. Principally, Defendants contend Mutual's decision to support King's exclusionary petitions before the FDA was merely parallel conduct, insufficient under <u>Twombly</u>'s pleading standard, and that Mutual's submissions to the FDA are irrelevant.[63] But Defendants' argument loses force upon consideration of the respective market positions of the telecommunications providers in <u>Twombly</u>, who did not compete in each others' markets, and the positions of King and Mutual here. Up to the point of the alleged agreement, Mutual was aggressively seeking to enter the market for generic SKELAXIN,[64] and Mutual and King took adverse positions on King's FDA petition that would have made non-infringing entry of Mutual and other generic competitors more difficult. King and Mutual were not, as in <u>Twombly</u>, companies merely seeking to entrench their own economic dominance in separate geographic markets in which they did not compete.[65] Nor is Mutual's support of King's FDA petitions the type of innocent parallel, but independent, action among competitors that is generally insufficient under <u>Twombly</u>. That is because King's petition on food-effect labeling was adverse, not advantageous, to Mutual's

---

[63] That the <u>Noerr-Pennington</u> doctrine might immunize Defendants from liability for petitioning government to impose market restraints does not prevent this Court from considering whether the FDA submissions make the agreement alleged here plausible; the underlying private agreement is not immunized by the doctrine. See <u>A.D. Bedell Wholesale Co., Inc. v. Philip Morris, Inc.</u>, 263 F.3d 239, 251 (3d Cir. 2001) (private parties cannot immunize an anticompetitive agreement by later requesting government approval).

[64] <u>In re Terazosin Hydrochloride Antitrust Litig.</u>, 352 F. Supp. 2d at 1315 n.34 ("[C]ourts have recognized that the mere filing of an ANDA is sufficient evidence that generic drug companies are competitors of brand-name manufacturers.").

[65] <u>Twombly</u>, 550 U.S. at 564–66.

economic interest in marketing its Second Generic.[66]  The timing of Mutual's about-face on

King's petition—two days after it entered into a co-exclusive licensing agreement with King for

a different product—also supports an inference that Mutual's newly found opposition was not

merely independent action.  This factual context at least suggests preceding agreement,  and "the

sort of restricted freedom of action and sense of obligation that one generally associates with

agreement."[67]  And that context makes it plausible that the licensing agreement, and any

payments made thereunder, were mere pretext for an agreement to refrain from marketing the

Second Generic or other generic equivalents.

Defendants contend that Mutual's change in position was innocuous given the Mutual-

King licensing agreement.  King argues that "Mutual's subsequent support of King's petition to

the FDA regarding [food-effect labeling] is entirely consistent with Mutual's status as a licensor

to King."[68]  But Defendants do not explain how or why a licensing agreement with respect to the

method patent for drug interactions would logically lead the licensor to subvert its ability to

market a generic drug for which it has a pending ANDA unless it had decided not to market the

Second Generic.  While Mutual could have made that decision unilaterally, the attendant

circumstances and timing of events here tend to exclude that possibility.  And, presumably, had it

made such a decision, it would have reversed its position on the FDA labeling rules before it

entered the licensing agreement with King.

---

[66]  See In re Baby Food Antitrust Litig., 166 F.3d 112, 122 (3d Cir. 1999) (additional plus factors that may show parallel action was not independent include "that the defendants: (1) acted contrary to their economic interests, and (2) were motivated to enter into a price fixing conspiracy").

[67]  Twombly, 550 U.S. at 557 n.4.

[68]  See King Reply at 8.

Additionally, Mutual's less-than-aggressive litigating position in the infringement action, together with the above facts also supports an inference that King and Mutual entered into an agreement at least with respect to sales of Mutual's Second Generic. The Court notes that as King and Mutual apparently stipulated to stay the infringement litigation, the expiration of the 30-month automatic stay on FDA approval was approaching. And Mutual's failure to inform the trial court that King's '102 and '128 Patents were held invalid and seek to lift the stay likewise was counter to its interest in marketing and selling the Second Generic. While this Court does not wish to second-guess Mutual's litigation strategy, these facts, in tandem with Mutual's support of King's petitions, enhance the plausibility of an agreement to refrain from marketing the Second Generic.

The Court finds, however, that Mutual's petition requesting that the FDA adopt labeling rules that would require generic competitors to include labeling information that would implicate the '566 method patent to be non-inculpatory, self-interested action, though counter to the interests of other generic competitors. Mutual held a method patent it sought to protect and for which it held a co-exclusive license with King. That either or both companies would seek to impede competitors does not alone suggest a conspiracy to restrict the output of the Second Generic or other generic equivalents.[69]

Nevertheless, the Court holds that the facts alleged in the First Amended Complaint, viewed as a whole as they must be,[70] are sufficient to nudge the allegation of an unlawful

---

[69] Twombly, 550 U.S. at 566 (parallel decisions to resist competition is insufficient to imply an antitrust conspiracy).

[70] In re Blood Reagents Antitrust Litig., -- F. Supp. 2d --, 2010 WL 3364218, at *6 (E.D. Pa. 2010).

agreement to restrict the output of generic equivalents to SKELAXIN "across the line from conceivable to plausible."[71]

## 2.    Antitrust Standing

A plaintiff seeking treble damages for a violation of the federal antitrust laws must have antitrust standing.[72]  This requires more than "injury-in-fact" and a "case or controversy;" it requires a determination that the plaintiff is the proper party to bring a private antitrust action.[73] The antitrust standing doctrine arises from judicial concern that despite the broad language of Section 4 of the Clayton Act, which provides that anyone injured "in his business or property by reason of anything forbidden in the antitrust laws" may bring a claim,[74] Congress did not intend to permit those only tangentially injured by a violation to recover treble damages.[75]  Thus courts apply a balancing test, weighing five factors:

> (1) the causal connection between the antitrust violation and the harm to the plaintiff and the intent by the defendant to cause that harm, with neither factor alone conferring standing; (2) whether the plaintiff's alleged injury is of the type for which the antitrust laws were intended to provide redress; (3) the directness of the injury, which addresses the concerns that liberal application of standing principles might produce speculative claims; (4) the existence of more direct victims of the alleged antitrust violations; and (5) the potential for duplicative

---

[71]  Twombly, 550 U.S. at 570.

[72]  Blue Shield of Va. v. McCready, 457 U.S. 465, 476–77 (1982).

[73]  Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters, 459 U.S. 519, 535 n.31 (1983).

[74]  15 U.S.C. § 15(a).

[75]  Blue Shield, 457 U.S. at 477; Allegheny Gen. Hosp. v. Philip Morris, Inc., 228 F.3d 429, 438 (3d Cir. 2000) (ancillary victims of the ripple effects from antitrust violations do not have standing).

recovery or complex apportionment of damages.[76]

The second of these factors, more commonly referred to as "antitrust injury," is a necessary, but insufficient factor, and if a court finds lack of antitrust injury it need go no further before dismissing the case.[77]  This Court's analysis thus begins and ends there.

### a.  Antitrust Injury

To successfully plead antitrust injury, a plaintiff must plead more than just injury causally related to the alleged anticompetitive conduct.  Instead, they must plead an "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful."[78]  This requires evaluating whether the injury suffered by a plaintiff reflects the central interest of the Sherman Act "in protecting the economic freedom of participants in the relevant market."[79]  The inquiry effectively imposes limits on *which* market actors can bring private antitrust actions by requiring that the injury claimed result from the anticompetitive outcomes of the alleged conduct.  Consequently, courts have generally limited "the class of plaintiffs capable of satisfying the antitrust-injury requirement . . . to consumers and competitors in the *restrained* market"[80] because of the reduced price competition or artificial restrictions on

---

[76] Barton & Pittinos, Inc. v. SmithKline Beecham Corp., 118 F.3d 178, 181 (3d Cir. 1997) (quotations and citations omitted).

[77] City of Pittsburgh v. West Penn Power Co., 147 F.3d 256, 264 n.14, 265 (3d Cir. 1998); (citing Barton & Pittinos,118 F.3d at 182).

[78] Alberta Gas Chems. Ltd. v. E.I. Du Pont De Nemours & Co., 826 F.2d 1235, 1240 (3d Cir. 1987) (quotations and citation omitted).

[79] Associated Gen. Contractors of Cal., 459 U.S. at 538.

[80] West Penn Allegheny Health Sys., Inc. v. UPMC, 627 F.3d 85, 102 (3d Cir. 2010) (emphasis added).

the freedom of competitors to operate in that market that such violations bring.  Thus, brokers, suppliers, contractors, sales representatives, and lessors that provide goods or services to competitors in the restrained market have not ordinarily suffered antitrust injury even though the anticompetitive scheme may have reduced or eliminated their sales of goods and services to those competitors.[81]  Their losses resulting from restrained competition in the downstream market "are merely byproducts of the anticompetitive effects of the restraint."[82]  Courts have identified exceptions to the competitor-consumer rule: where the injury suffered is "inextricably intertwined" with the wrongdoing, the plaintiff has suffered antitrust injury though not a competitor or consumer.[83]  An injury may be inextricably intertwined when it is a necessary step in, integral to, or the very means used to achieve the anticompetitive outcome,[84] or "is the precisely intended consequence of the defendants' anticompetitive conduct."[85]  For the purposes of this inquiry, the Court will assume the alleged agreement occurred.[86]

---

[81]  See, e.g., id. at 102 (suppliers); McCullough v. Zimmer, Inc., 382 F. App'x 225, 229 (3d Cir. 2010) (commission-based sales representatives); Gregory Mktg. Corp. v. Wakefern Food Corp., 787 F.2d 92, 96–97 (3d Cir.1986) (broker was neither consumer nor competitor in juice market); Schuylkill Energy Res., Inc. v. Pa. Power & Light Co., 113 F.3d 405, 415 (3d Cir. 1997) (exclusive supplier to competitor); Barton & Pittinos, 118 F.3d at 184 (advertisers and brokers); Delco LLC v. Giant of Maryland, LLC, No. 07-3522, 2007 WL 3307018, at *10 (E.D. Pa. Nov. 8, 2007) (lessors) (citing cases).

[82]  West Penn Allegheny Health Sys., 627 F.3d at 102.

[83]  Carpet Grp. Int'l v. Oriental Rug Importers Ass'n, Inc., 227 F.3d 62, 76–77, 78 (3d Cir. 2000).

[84]  See, e.g., West Penn Allegheny Health Sys., 627 F.3d at 102; Allegheny Gen. Hosp., 228 F.3d at 438.

[85]  Carpet Grp., 227 F.3d at 78 (citations and quotations omitted).

[86]  The Third Circuit has cautioned courts not to confuse the substantive element of anticompetitive harm required to state an antitrust claim with the standing requirement of antitrust injury. See Angelico v. Lehigh Valley Hosp., Inc.,184 F.3d 268, 275 n.2 (3d Cir. 1999).

Sigmapharm asserts that it has suffered antitrust injury because it lost royalties when Mutual failed to commercialize the Second Generic pursuant to its unlawful agreement with King. It argues that because it has contractual rights to the profits in the suppressed product, it is a market " participant," not a supplier, whose injuries are inextricably entwined with the marketplace injury of reduced output and higher prices.[87] And it argues that this loss "flows" from those anticompetitive results.

The Court disagrees. SigmaPharm's alleged injury is precisely the type of ancillary or tangential harm that courts have repeatedly held does not constitute antitrust injury. A proper antitrust plaintiff is an adversely affected market participant in the *restrained* market. Here that market is generic SKELAXIN and the adverse impact is higher prices and restricted entry. SigmaPharm does not assert it manufactures or markets any pharmaceuticals in the United States. And because SigmaPharm expressly disclaimed any rights to own, market, manufacture or sell the innovations it developed under the development agreement with Mutual, SigmaPharm is not even a *potential* competitor of the Second Generic and other products it developed. Instead it is a contract drug developer that has not alleged that its access to the market in which *it* operates—drug development—was in any way restrained by the agreement.[88] And even if it could allege this, it would not change the outcome. Such injury to an input market would remain too remote from the harms that antitrust law seeks to prevent by prohibiting output-restricting

---

[87] SigmaPharm Mem. in Opp'n to King Pharms. Inc.'s Mot. to Dismiss Counts I–III of SigmaPharm's First Am. Compl. ("SigmaPharm Resp. in Opp'n") at 10–11.

[88] Cf. Stark v. Ear Nose & Throat Specialists of Nw. Pa., P.C., 185 F. App'x 120, 125 (3d Cir. 2006) (no standing where alleged anticompetitive conduct restrained the market for physicians and medical research and plaintiffs provide research study contract services or contract support to physicians and drug manufacturers).

agreements in the downstream market.

The Seventh Circuit's decision in <u>Repp v. F.E.L. Publications</u> is instructive: there the plaintiff, a music composer, complained that its publisher's allegedly unlawful practice of using blanket licenses reduced his royalties by discouraging buyers from purchasing his works.[89]  The court held that the anticompetitive injuries sought to be prevented by antitrust law in that circumstance included coercing music users into buying more product than they required and restricting entry of lesser known artists by preventing them from offering individual works at lower prices than pieces offered by well-known artists—injuries Repp did not complain he had suffered.[90]  The court thus held his injuries were not the type the antitrust laws were intended to protect.[91]  Similarly, SigmaPharm complains of lost royalties, not of the harms that market allocation or supply agreements inflict on the restrained market—increased prices and restricted entry.  SigmaPharm was neither a consumer nor a competitor since, by contract, it could not have entered the restrained market or insisted on commercialization of the drug.  Thus, "the source of [SigmaPharm's] right not to be deprived of royalties . . . is [the contract with Mutual], not the federal antitrust laws."[92]

SigmaPharm's belief that its "economic rights" in sales of Second Generic somehow differentiate it from an average supplier is misplaced.  To be sure, the development agreement gave SigmaPharm an economic *interest* in sales of the Second Generic, but that interest is

---

[89]  <u>Repp v. F.E.L. Publications, Ltd.</u>, 688 F.2d 441, 443 (7th Cir. 1982).

[90]  <u>Id.</u> at 445–46.

[91]  <u>Id.</u> at 446.

[92]  <u>Id.</u> at 447.

insufficient: Those with contractual rights to a portion of the sales revenues of a product or service that they do not produce or offer do not suffer antitrust injury when the sales of that product or service are unlawfully suppressed.[93]  Here, SigmaPharm effectively bargained for deferred and contingent compensation for its services as a drug developer.  That such compensation was in the form of royalties from drug sales does not change SigmaPharm's fundamental position as a contractor supplying drug-formulation services.  The Court can find no principled basis for distinguishing between SigmaPharm's lost royalties and the losses suffered by any service provider whose compensation is linked to sales of a suppressed product in another market.[94]

And though SigmaPharm argues its injury is inextricably intertwined with the injury to the marketplace,[95] nothing it alleges suggests the denial of royalties was necessary or integral to

---

[93]  See, e.g., R.C. Dick Geothermal Corp. v. Thermogenics, Inc., 890 F.2d 139, 148 (9th Cir. 1989) (en banc) ("Mere injury as a landlord or lessor entitled to royalties would not by itself be the kind of injury to competition that the antitrust laws are designed to prevent. . . . [T]he injured party [must] be a participant in the same market as the alleged malefactors."); Productive Inventions, Inc. v. Trico Prods Corp., 224 F.2d 678, 679–80 (2d Cir. 1955) (patent licensor only incidentally injured by antitrust violation harming its licensee's business that resulted in loss of royalties); SCM Corp. v. Radio Corp. of Am., 407 F.2d 166, 170 (2d Cir. 1969) (patentor's injury from lost revenues resulting from licensees' injuries does not give it standing to sue); Melrose Realty Co. v. Loew's, Inc., 234 F.2d 518, 518 (3d Cir. 1956) (citing Harrison v. Paramount Pictures, Inc., 211 F.2d 405 (3d Cir. 1954) (no antitrust standing for non-operating owner and lessor of a movie theater entitled to share of lessee's receipts where lessee allegedly conspired with another theater owner that resulted in reduced receipts), cert. denied 352 U.S. 890 (1956).  Cf. Esai, Inc. v. Sanofi-Aventis, LLC, No. 08-4168, 2010 WL 3172187, at *8 (D.N.J. Aug. 10. 2010) (no antitrust injury suffered by contract drug manufacturer that retained only a royalty interest because "fewer or non-existent royalties under the profit-sharing arrangement . . . is not the type of injury to be redressed by the antitrust laws . . . .").

[94]  McCullough, 382 F. App'x. at 229 (commission-based sales representatives suffered no cognizable antitrust injury as a result of Defendants' alleged anticompetitive conduct in the market for the orthopaedic devices they sold).

[95]  SigmaPharm Resp. in Opp'n at 11–12.

effectuating the agreement, the means by which the agreement was carried out, or an intended consequence of the agreement.  SigmaPharm relies primarily on two cases in which foreign manufacturers of prescription drugs were held to have antitrust standing though they used an intermediary to market and sell the drug in the United States: <u>Chemi S.p.A. v. GlazoSmithKline</u>[96] and <u>EthylPharm S.A. France v. Abbott Laboratories</u>.[97]  In both cases, the plaintiff was a manufacturer of the pharmaceutical for which the market was allegedly restrained, but relied on U.S. distributors to sell the product in the U.S.  Though the manufacturers were not *direct* competitors in the market, both courts held the Plaintiffs' injuries were inextricably entwined with the injury to market for the drug.[98]  The anticompetitive agreement prevented the foreign manufacturers from selling their drugs—products which directly competed in the restrained market—to vendors who resold them in the U.S.  SigmaPharm erroneously analogizes its market position to that of Chemi and Ethylpharm, asserting that because it attempted to "commercialize" metaxalone "through its agreement with Mutual," it too is a market participant.[99]  But unlike Chemi and Ethylpharm, SigmaPharm is not a manufacturer of the restrained product, and it cannot transform itself into one by relabeling its services contract with Mutual as an agreement to "commercialize" drugs.  And the alleged restraint does not prevent SigmaPharm from offering drug development services to others in the market.  Finally, in both of the cases, the anticompetitive scheme could not have been effectuated without inflicting the harm on Chemi

---

[96]  356 F. Supp. 2d 495 (E.D. Pa. 2005).

[97]  598 F. Supp. 2d 611 (D. Del. 2009).

[98]  <u>Chemi</u>, 356 F. Supp. 2d at 502; <u>Ethylpharm</u>, 598 F. Supp. 2d at 617–18.

[99]  SigmaPharm Resp. in Opp'n at 12; FAC ¶ 24.

and Ethylpharm because the generics they produced were the very object of the conspiracy.[100] But here, Mutual and King could effectuate their agreement to restrain generic SKELAXIN with no impact on SigmaPharm whatever because the development agreement obligated Mutual to pay SigmaPharm 25% of the proceeds from any deal to refrain from marketing the Second Generic. Had Mutual abided by that term here, SigmaPharm could claim no injury because it had no contractual right to insist on commercialization even if sales royalties would have been higher.[101] Its injuries thus flow from the breach of contract, not from an antitrust violation.

Accordingly, because SigmaPharm's injury does not flow from higher prices for SKELAXIN or restricted entry into the market for generic equivalents, was not inextricably intertwined with those harms, and is attributable to Mutual's breach of contract not from any antitrust violation, SigmaPharm has not alleged antitrust injury and therefore lacks standing.

### b.      Other Balancing Factors

While the Court need not address the remaining balancing factors, it touches briefly on the fourth—the existence of more direct victims of the alleged antitrust violation—because of its grave concerns about SigmaPharm's interests here.  This factor discourages a finding of standing for a remote victim of the unlawful conduct when there is a class of victims who would

---

[100]  Chemi, 356 F. Supp. 2d at 501 (monopoly was designed to prevent the sale of Chemi's product); Ethylpharm, 598 F. Supp. 2d at 618 (intent of conspiracy was to harm EthylPharm).

[101]  For this reason, the Court rejects SigmaPharm's argument that there is "no necessary congruence" between the losses from the antitrust violation (lost sales royalties) and the losses from the breach claim (failure to remit 25% of King's payment to Mutual).  See SigmaPharm Resp. in Opp'n at 10.

ordinarily be motivated to bring a private enforcement action.[102]

Even if this Court were to find SigmaPharm had suffered antitrust injury, it would find SigmaPharm lacks standing because, contrary to SigmaPharm's assertion,[103] there are far more direct victims of the alleged conspiracy, and SigmaPharm's interests diverge from, rather than align with, their interests. First, consumers of SKELAXIN, such as patients, pharmacists, and third-party payers, are more directly injured by the alleged conspiracy because they paid inflated prices for the drug. So, too, are drug manufacturers who sought to enter the market for generic SKELAXIN—efforts the conspiracy allegedly restrained. Those victims have suffered the types of injury the antitrust laws are designed to prevent.[104]

Moreover, SigmaPharm's economic interests are not aligned with the interests of those more direct victims. First, SigmaPharm expressly contracted to gain from an agreement to refrain from marketing generic SKELAXIN. Second, under the development agreement, SigmaPharm earns less, on a percentage basis, as more generic competitors enter the market. SigmaPharm's royalties from sales are the highest when only Mutual (or its licensee) markets a

---

[102] Associated Gen. Contractors, 459 U.S. at 542 ("The existence of an identifiable class of persons whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement diminishes the justification for allowing a more remote party . . . to perform the office of a private attorney general.").

[103] SigmaPharm Resp. in Opp'n at 14 ("[T]here is no more direct victim of defendants unlawful scheme than SigmaPharm.").

[104] 2660 Woodley Road Joint Venture v. ITT Sheraton Corp., 369 F.3d 732, 741–42 (3d Cir. 2004) (market players excluded by the restraint are more direct victims that suffered injury antitrust laws address); Southaven Land Co., Inc. v. Malone & Hyde, Inc., 715 F.2d 1079, 1087 (6th Cir. 1983) (noting "[m]ore direct victims may justify denial of a § 4 remedy to those only tangentially injured [sic]," and finding "two categories of potential plaintiffs—consumers and participants—are obviously more direct victims" than lessor-plaintiff).

given "innovation," and are reduced to nothing as more generic competitors enter the market. Thus, SigmaPharm gains when there is either no competition to SKELAXIN because of an agreement to refrain from marketing the drug, or when there is a duopoly. Both set up incentives that are aligned with neither market entrants nor with consumers. And "[w]hen the plaintiff is a poor champion of consumers, a court must be especially careful not to grant relief that may undercut the proper functions of antitrust."[105] Thus this Court would not recognize standing here even if it found SigmaPharm had suffered antitrust injury.

### B.      Supplemental Jurisdiction Over the State Law Claims

The only claims remaining (Counts II through IV) are based on Pennsylvania or California law. Although federal courts with original jurisdiction over a federal claim have supplemental jurisdiction over state claims that form "part of the same case or controversy," a court may decline to exercise supplemental jurisdiction over state law claims if "the district court has dismissed all claims over which it has original jurisdiction."[106] The Third Circuit directs that, "where the claim over which the district court has original jurisdiction is dismissed before trial, the district court must decline to decide the pendent state claims unless considerations of judicial economy, convenience, and fairness to the parties provide an affirmative justification for doing so."[107]

Here, these factors warrant dismissal of the state law claims. There is no judicial

---

[105] <u>Ball Mem'l Hosp., Inc. v. Mutual Hosp. Ins., Inc.</u>, 784 F.2d 1325, 1334 (7th Cir. 1986).

[106] 28 U.S.C. § 1367(a), (c)(3).

[107] <u>Borough of W. Mifflin v. Lancaster</u>, 45 F.3d 780, 788 (3d Cir. 1995) (citing *inter alia* <u>Growth Horizons, Inc. v. Del. Cnty.</u>, 983 F.2d 1277 (3d Cir. 1993)).

economy in trying the state claims here because the case is in its early stages, an answer has not been filed, and trial has not been scheduled.[108]  Nor does SigmaPharm suffer any prejudice or unfairness since it may transfer its claims to state court.[109]  Because no federal issues remain, the Court will dismiss the state law claims without prejudice.

## IV. CONCLUSION

For the foregoing reasons, the Court will dismiss without prejudice the Sherman Act claim and decline to exercise supplemental jurisdiction over the Pennsylvania and California state law claims.   An appropriate Order follows.

---

[108]  See, e.g., Plum Prop. Assocs., Inc. v. Mineral Trading Co., No. 09-1059, 2009 WL 5206013, at *5 (W.D. Pa. Dec. 23, 2009) (declining to exercise jurisdiction over state law claims after dismissing federal claims because of the early stage of proceeding prior to significant discovery).

[109]  See Williams v. F.L. Smithe Mach. Co., 577 A.2d 907, 909 (Pa. Super. 1990) (under 42 Pa. C.S.A. § 5103(b), plaintiff may transfer to state court a timely filed action in federal court that is dismissed for lack of jurisdiction, and state action will be deemed filed on the date it was first filed in the federal court).